RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206
File Name: 12a0001p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————————

In re: DANIEL JOSEPH SUTTER; SHERYL LYNN
SUTTER,

　　　　　　　　　　　　　　　*Debtors.*

——————————————————————

DANIEL JOSEPH SUTTER; SHERYL LYNN
SUTTER,

　　　　　　　　　　　　　　　*Appellees,*

　　　v.

U.S. NATIONAL BANK; SAXON MORTGAGE
SERVICES, INC.,

　　　　　　　　　　　　　　　*Appellants.*

No. 10-1656

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 09-11816—Anna Diggs Taylor, District Judge.

Argued: October 12, 2011

Decided and Filed: January 3, 2012

Before: BATCHELDER, Chief Judge; SILER and COLE, Circuit Judges.

———————————

## COUNSEL

**ARGUED:** David A. Lerner, PLUNKETT COONEY, Bloomfield Hills, Michigan, for
Appellants. Rex C. Anderson, Davison, Michigan, for Appellees. **ON BRIEF:** David
A. Lerner, PLUNKETT COONEY, Bloomfield Hills, Michigan, Hilary A. Ballentine,
PLUNKETT COONEY, Detroit, Michigan, for Appellants. Rex C. Anderson, Davison,
Michigan, for Appellees.

---

**OPINION**

---

COLE, Circuit Judge.   Appellants U.S. National Bank and Saxon Mortgage Services, Inc., appeal the order of the district court overturning a judgment of the bankruptcy court granting them an equitable mortgage on property owned by Debtors Daniel and Sheryl Sutter.  We AFFIRM the judgment of the district court.

## I.  BACKGROUND

*A.  The World Wide Mortgage*

In September 1994, Daniel and Sheryl Sutter ("the Sutters") bought a home in Lapeer, Michigan ("the Sutter property").  Beginning sometime in the mid to late 1990s, the Sutters experienced financial difficulties that ultimately resulted in the filing of a petition under Chapter 7 of the bankruptcy laws, followed by a grant of discharged issued by the Bankruptcy Court for the Eastern District of Michigan on January 30, 2004.

Prior to entry of the discharge, the Sutters attempted to refinance their existing mortgages on the subject property.  Eventually, they came into contact with World Wide Financal Services, Inc. ("World Wide"), also known as LoanGiant.com.[1]  Following the entry of discharge, World Wide agreed to refinance the Sutters' loan and mortgage obligations by issuing a new mortgage on their property, to be funded by New Century Mortgage Corporation.  In order to facilitate a quick closing, the Sutters requested to close the refinancing transaction in California, where they would be visiting as part of

---

[1]At the time, World Wide was a "sub-prime home mortgage lender [that had been] located in Southeastern Michigan since 1994. . . .   In 2000, World Wide expanded its business to the Internet, with a presence as LoanGiant.com." *Aleynu, Inc. v. Universal Prop. Dev. & Acquisition Corp.*, No. 1:07-cv-11707, 2008 WL 3252342 at *2 (E.D. Mich. Aug. 5, 2008).  On February 24, 2006, the Commissioner of Michigan's Office of Financial and Insurance Services issued and entered a consent order finding that World Wide had violated prior consent orders, engaged in improper lending practices, and providing that World Wide "shall not enter into any new transactions to broker, lend, or service mortgage loans."   *See* 2006 Consent Order at 2, 3, available at http://www.michigan.gov/documents/WorldWideFinancialConsentOrder_159502_7.pdf

a previously scheduled vacation. World Wide agreed to this request, and arranged for a closing in Sacramento, California, on April 8, 2004.

At the April 8 closing, the Sutters signed a note payable to World Wide in the amount of $78,000. The Sutters signed a number of additional documents in connection with their refinancing, but apparently did not sign a mortgage instrument. Nevertheless, New Century provided the funds to pay off the two existing mortgages on the Sutter property, as well as allowing the Sutters to pay off additional existing debts. At some point after the closing, World Wide and New Century assigned the mortgage instrument ("the World Wide mortgage") to U.S. National Bank, with Saxon Mortgage Services, Inc. ("Saxon") as the mortgage servicer (collectively "the Appellants").

*B. Initial Proceedings in the Bankruptcy Court*

Within a few months of the closing, the Sutters began to fall behind on their payments on the World Wide mortgage. When Appellants initiated foreclosure proceedings, the Sutters filed a Chapter 13 bankruptcy petition on November 21, 2005. Saxon filed a proof of claim in the Sutters' Chapter 13 case asserting a secured claim in the amount of $83,498.26, secured by the Sutter property. Attached to the proof of claim was the World Wide mortgage, notarized and ostensibly bearing the signatures of the Sutters. The certificate of acknowledgement on the World Wide mortgage states that "[t]he foregoing instrument was acknowledged before me [the notary] this April 8th, 2004, by Daniel J. Sutter and Sheryl L. Sutter, his wife" in the State of Michigan, County of Oakland. The mortgage was recorded with the Lapeer County, Michigan, Register of Deeds on May 25, 2004.

The Sutters filed an objection to the proof of claim, alleging that it should be disallowed because their signatures on the mortgage instrument were forged. In addition, the Sutters brought an adversary proceeding against the Appellants, asserting a variety of claims for relief under the Bankruptcy Code, other federal statutes, and Michigan law. Count I of the complaint sought the disallowance of the claim pursuant to 11 U.S.C. § 502(b)(1). Count II, pleaded in the alternative to Count I, sought to avoid the transfer of the secured interest represented by the World Wide mortgage and return

of any such property interest to the bankruptcy estate, pursuant to 11 U.S.C. § 544(a)(3) (the "strong-arm" provision). Both counts sought a judgment "extinguishing, expunging, and avoiding all claimed interest [of U.S. National Bank and Saxon] in the Debtor's property."

At the April 24, 2007 hearing on the Sutters' adversary proceding ("the April 2007 hearing"), the bankruptcy court found as part of its findings of fact that "the debtors have established by the necessary burden of proof that the signatures on the mortgage before the Court are not theirs." This determination was based on the uncontested fact that, while the certificate of acknowledgement states that the Sutters acknowledged their signatures on the mortgage in Michigan, the Sutters were in California on April 8, 2004, the date on which they supposedly signed it. The bankruptcy court concluded that those who acquire "interest under a forged instrument are in no better position as to title that they had purchased with notice." Thus, the bankruptcy court granted summary judgment on Count I to the Sutters, disallowing Saxon's claim.

At the same hearing, the bankruptcy court also indicated that it would grant summary judgment to the Sutters on Count II. In addition, at the end of the hearing, the court raised the issue of whether an equitable mortgage should be imposed between Appellants and the Sutters. Although the court did not render a decision on the issue, it did instruct the trustee to "monitor the case very closely" and noted that the court "reserves the right if need be to address the equitable mortgage issue." The trustee submitted a proposed order stating that the World Wide mortgage "is hereby avoided and preserved for the benefit of the bankruptcy estate pursuant to 11 U.S.C. § 551." The court ultimately signed the order tendered by the Chapter 13 trustee ("the July 2007 Order"). Neither the Sutters, U.S. National Bank, nor Saxon appealed this order.

Soon after the hearing, the Sutters filed an Amended Chapter 13 plan. The amended plan listed the Appellants' claim as that of an unsecured creditor and the mortgage as void *ab initio*. On September 19, 2007, the Chapter 13 trustee filed a motion to sell the World Wide mortgage to Appellants for $30,000, relying on the provision in the July 2007 Order avoiding the World Wide mortgage for the benefit of

the estate. The trustee also proposed, once the sale was completed, to abandon the Sutter property, presumably so Appellants could complete foreclosure proceedings on it. In return, Appellants agreed to waive any additional claims against the estate. The bankruptcy court granted the trustee's motion to sell the World Wide mortgage on March 12, 2008, via a minute order.

*C. Appeals to the District Court*

The Sutters filed a notice of appeal to the District Court for the Eastern District of Michigan, pursuant to 28 U.S.C. § 158 on March 7, 2008. In a memorandum opinion and order, the district court reversed the orders of the bankruptcy court and remanded for clarification. The district court relied on the finding of facts made by the bankruptcy court at the April 2007 hearing and concluded that the bankruptcy court made "an inference that the signatures had been forged." Referencing Michigan law, the district court stated that "[w]here a deed is forged, those innocently acquiring interests under the forged deed are in no better position as to title than if they had purchased with notice." The district court noted that the bankruptcy court had suggested, but did not definitively hold, that an equitable mortgage might exist on the Sutter property, and reversed and remanded for consideration of the equitable mortgage issue. This order was not appealed.

On remand, after a hearing, the bankruptcy court imposed an equitable mortgage on the Sutter property. The court relied on the Sutters' receipt of the benefits of the mortgage as the basis for imposing the equitable mortgage. The court also rejected the Sutters' "unclean hands" argument on the theory that "[d]ebtors did not allege or prove that U.S. Bank or Saxon engaged in any improper conduct."

The Sutters appealed the bankruptcy court's decision to the district court. The district court once again reversed the bankruptcy court, ruling that, because "no transfer ever occurred" as a result of the World Wide mortgage, the mortgage was void *ab initio* and there could be no equitable transfer of the interest to the trustee. This appeal followed.

## II.  ANALYSIS

Before us in this appeal is the district court's judgment holding that an equitable mortgage does not exist on the Sutter property.  The district court also found, in both this order and its previous order, that the World Wide mortgage was void under Michigan law.  Legal conclusions made by the district court when functioning as an appellate court for bankruptcy decisions are reviewed de novo.  *McMillan v. LTV Steel, Inc.*, 555 F.3d 218, 225 (6th Cir. 2009);  *In re Batie*, 995 F.2d 85, 88 (6th Cir. 1993).  We directly review a bankruptcy court's factual findings for clear error.  *McMillan*, 555 F.3d at 225.

A.  *The Status of the Sutters' Mortgage Was Properly Considered by the District Court*

As a threshold matter, Appellants argue that the district court should not have considered whether the mortgage was void under Michigan law, because the Sutters sought, and the bankruptcy court held, that the mortgage was avoided for the benefit of the bankruptcy estate, not voided as a matter of law.  This claim is unavailing for several reasons.

First, Appellants are incorrect that the Sutters sought only to avoid the mortgage in their original filing.  The Sutters did seek to avoid the mortgage for the benefit of the estate in Count II of their challenge to the claim, but Count II was pleaded in the alternative to their primary argument in Count I.  In Count I, the Sutters alleged "[t]hat under applicable state law a forged mortgage will not pass title rights to anyone, including the mortgagee, subsequent assignees or bona fide purchasers" and requested that the court:

> extinguish[], expung[e], and avoid[] all claimed interest in the debtors' property and further order a $100/day penalty for each day that the Debtors' property remains encumbered by the invalid lien beyond the date to be determined by the court in which the Appellant is ordered to remove its lien from the public records containing it therein.

While the Sutters did not use the specific phrase "void ab initio," there is no question that Count I sought to have the mortgage declared void pursuant to Michigan law.

Appellants further argue that the Sutters waived this issue by not appealing the July 2007 order.  That order granted relief to the Sutters on both Counts I and II of their complaint.  Appellants argue that because all subsequent rulings of the bankruptcy court were based on the mortgage being avoided pursuant to Count II, the July 2007 Order actually held that the World Wide mortgage was not void and instead avoided in favor of the estate.  By failing to appeal the July 2007 Order, Appellants argue the Sutters waived any argument that the World Wide was mortgage was void.  This is an unreasonable interpretation of the July 2007 order.  The order clearly grants the relief the Sutters were requesting in Count I.  When later orders of the bankruptcy court construed the Sutters' mortgage as avoided, rather than voided, the Sutters filed timely appeals of those decisions.  The Sutters preserved their claims for appeal.

In any event, before us is the decision of the district court concluding that no equitable mortgage arose on the Sutter property.  There is no question that the district court considered whether the mortgage was void in issuing both of its rulings in this case, and thus both the legal conclusion and factual findings of the district court are before us.  Even construing Appellants' argument as a challenge to the district court's consideration of the status of the World Wide mortgage, the Appellants' claim fails.  Appellants forfeited any objections to consideration of whether the mortgage is void by failing to appeal the first order of the district court.  The district court clearly ruled that the mortgage was void when it remanded the case back to the bankruptcy court.  To the extent that this was an improper consideration by the district court, the Appellants should have appealed that ruling to this court.  Failure to do so bars later attempts to raise the issue. *JGR, Inc. v. Thomasville Furniture Indus., Inc.*, 550 F.3d 529, 532 (6th Cir. 2008) ("The law-of-the case doctrine bars challenges to a decision made at a previous stage of litigation which could have been challenged in a prior appeal, but were not.") (quoting *United States v. Adesida*, 129 F.3d 846, 850 (6th Cir. 1997)).

*B. The World Wide Mortgage is Void Ab Initio*

The district court's conclusion that the World Wide mortgage was void *ab initio* was based on the bankruptcy court's factual findings that the Sutters did not sign the World Wide mortgage and that their signatures had been forged. The bankruptcy court held that "[t]he Court is well satisfied the debtors have established the necessary burden of proof that the signatures on the mortgage before the Court are not theirs." The court based its findings on the fact that the World Wide mortgage indicates that the Sutters signed the document in Michigan on April 8th, 2004, when it is undisputed that they were in California on that date. While the Appellants have offered various theories during the course of this litigation for this discrepency, they have offered no evidence to support any scenario other than forgery by World Wide or its agents. Counsel for Appellants conceded at oral argument in this appeal that the mortgage was forged, and Appellants also noted that a claim has been filed against the bond of the notary who attested to the alleged signatures of the Sutters. Accordingly, the district court's factual finding that the World Wide mortgage was forged is not clearly erroneous.

The district court also held that, under Michigan law, a forged mortgage is void *ab initio*. In *Horvath v. National Mortgage Co.*, the plaintiffs challenged a deed that bore their signatures, on the theory that they had been led to believe they were signing power of attorney documents, not a deed. 213 N.W. 202, 202-03 (Mich. 1927). After determining that there was no "distinction between the act of simulating a signature and procuring the signature [by trickery]," the Michigan Supreme Court concluded that the deed in question was void. 213 N.W. at 204. The Court made clear that "[t]here can be no such thing as a bona fide holder under a forgery, whose good faith gives him any rights against the party whose name has been forged or his heirs." *Id.* (quoting *Austin v. Dean*, 40 Mich. 386 (Mich. 1879)). As a result, the deed and subsequent transactions based on the deed "are void and should be set aside . . . ." *Id.* More recent Michigan cases have confirmed this principle and emphasized that parties that take possession of interests granted by the forged instrument, even if they do so innocently, have no rights under the forged document. *Special Property VI v. Woodruff*, 730 N.W.2d 753, 756

(Mich. Ct. App. 2007); *VanderWall v. Midkiff*, 421 N.W. 263, 270 (Mich. Ct. App. 1988). Mortgages are treated in the same manner as deeds under Michigan law, and equally grant no interests to the holder of a forged mortgage. *La Prad v. Sherwood*, 44 N.W. 943, 944 (Mich. 1890).

Therefore, the district court was correct in holding that the World Wide mortgage on the Sutters' property was void *ab initio*.

*C. An Equitable Mortgage Cannot Be Imposed on the Sutter Property*

Even if the World Wide mortgage were void, and thus not avoidable for the benefit of the estate, the trustee's proposed plan to sell the mortgage back to Appellants likely could be salvaged if an equitable mortgage exists on the property. An equitable mortgage is generally imposed when one party intended to grant a secured interest but the instrument actually transferred the property in total to the other party. *See Townsend v. Chase Manhattan Mortg. Corp.*, 657 N.W.2d 741, 744 n.1 (Mich. Ct. App. 2002) (discussing the normal uses of equitable mortgages). Michigan law is clear that equitable mortgages are appropriate in circumstances where the underlying mortgage is void, particularly when one party received the benefits of the mortgage. *See Fair v. Moody*, No. 278906, 2008 WL 5382648 (Mich. Ct. App. Dec. 23, 2008) (holding that an equitable mortgage can exist where there are allegations of forged mortgage instruments); *In re Estate of Moukalled*, 714 N.W.2d 400, 407-09 (Mich. Ct. App. 2006) (granting an equitable mortgage where a land contract, which purported to give a security interest in real property, was invalid under the Uniform Commercial Code).

Nevertheless, the district court correctly found that an equitable mortgage should not be imposed in this case. Michigan courts abide by the standard maxim that one "who comes into equity must come with clean hands. . . ." *Rose v. National Auction Group, Inc.*, 646 N.W.2d 455, 461 (Mich. 2002) (quoting 2 Pomeroy's Equity Jurisprudence, ch. I, § 397, p. 90 (1941)). The Michigan Supreme Court has emphasized that unclean hands jurisprudence is:

> a self-imposed ordinance that closes the doors of a court of equity to one tainted with inequitableness or bad faith relative to the matter in which he seeks relief, *however improper may have been the behavior of the Appellant*. That doctrine is rooted in the historical concept of the court of equity as a vehicle for affirmatively enforcing the requirements of conscience and good faith. This presupposes a refusal on its part to be the abettor of iniquity.

*Rose*, 646 N.W.2d at 461 (quoting *Stachnik v. Winkel*, 230 N.W.2d 529, 532 (Mich. 1975) (emphasis in the original) (internal quotation marks and citations omitted)). The clean hands doctrine applies to actions involving the resolution of claims on real property. *McFerren v. B & B Investment Group*, 655 N.W.2d 779, 783 (Mich. Ct. App. 2002). When a party is assigned a contract such as a mortgage, the party stands in the place of the original party for equitable purposes, and is subject to all of the same equitable defenses to which the originating party would be subject. *Burkhardt v. Bailey*, 680 N.W.2d 453, 462 (Mich. Ct. App. 2004). This is true whether or not the assignee has notice of the existence of the defense. *McKenna v. Kirkwood*, 15 N.W. 898, 898-99 (Mich. 1883). This principle extends to a defense that the mortgage is forged. *Waterbury v. Andrews*, 34 N.W. 575, 578 (Mich. 1887).

When U.S. National Bank took ownership of the mortgage from World Wide, they inherited the mortgage subject to all equitable defenses that the Sutters would have against World Wide. Thus, to determine whether Appellants have unclean hands, we look not to U.S. Bank's actions, but to the actions of World Wide. As we have noted, the district court found that at some point during the period of time when World Wide had possession of the mortgage instrument, World Wide or its agents forged the Sutters' signatures. Neither World Wide, nor by extension Appellants, may seek an equitable remedy that would protect them from the consequences of their own improper conduct. *See Society of Good Neighbors v. Van Antwerp*, 36 N.W.2d 308, 310 (Mich. 1949) ("He who hath committed iniquity shall not have equity . . . "). The consequence of the forgery of the Sutters' mortgage is that the mortgage is void *ab initio*. Appellants may not receive an equitable remedy to eliminate that consequence.

Appellants cite *Richardson v. Richardson* and *Fair v. Moody* as Michigan authority for applying an equitable mortgage despite allegations of misconduct regarding the purported mortgage on the property. Those cases are distinguishable on their facts, as they both involve scenarios where there is no doubt that the original mortgagee was a innocent actor. *Richardson* involved a claim that a son convinced his illiterate mother to place her mark on a mortgage document without telling her what she was signing. There was no claim that the bank participated in this deception, and thus the bank was entitled to equitable relief. *Richardson*, 253 N.W. at 266. In *Fair*, LaSalle Bank and the other mortgage institutions were arguably the only party with clean hands in the complex series of transactions leading up to the mortgage. *See* 2008 WL 5382648 at *10 ("First, we do not find any basis to conclude that BNC, MERS, or LaSalle had unclean hands such that an equitable mortgage should be denied."). None of the Michigan cases involve improper activity by the mortgagee, the party that is the beneficiary of the equitable mortgage.

Likewise, our decision in *Schram v. Burt* is not controlling. 111 F.2d 557 (6th Cir. 1940). *Schram* involved a forgery of a woman's signature on a mortgage, carried out by her husband and the teller at the bank. 111 F.2d at 559. When the wife attempted to void the mortgage after the death of her husband, the court acknowledged the forged mortgage as invalid but imposed an equitable mortgage, relying on the fact that she had benefitted from the proceeds of the mortgage loan. *Id.* at 562.

*Schram* does not address Michigan's unclean hands jurisprudence with regard to the bank's role in the forgery, despite the fact that the case arose in Michigan. Presumably this is because the actions of the teller could not be attributed to the bank because the teller had no authority to notarize any signatures, and thus the bank could not be held liable for the actions of the teller. *Id.* at 564. Nevertheless, a federal court is obligated to look to state law to determine a party's legal and equitable rights to property, unless there is a federal interest at issue. *In re Bergman*, 467 F.3d 536, 538 (6th Cir. 2006). To the extent that *Schram* is in conflict with Michigan case law regarding unclean hands, we are obligated to follow the Michigan cases. In addition,

*Schram* focuses on the rule that a married couple are "one person" for legal purposes, and is thus "subject to all the equities of creditors of the co-ownership" when the property is a tenancy by the entireties. *Schram*, 111 F.2d at 561. Thus, the court concluded that the wife is implicated by the husband's participation in the forgery. No similar scenario is present here. *See also Townsend*, 657 N.W.2d at 744 (distinguishing *Schram* from the facts of its case on both the agency and attribution elements in declining to grant an equitable mortgage).

Similarly, cases from other jurisdictions that have applied equitable mortgages to similar factual scenarios are inconsistent with Michigan equity jurisprudence. In *In re Cox*, the bankruptcy court held that an equitable mortgage could be imposed where the purported mortgage was forged because the homeowners expressed that they would have signed the document if it had been presented to them. 408 B.R. 407, 414 (Bankr. D. Kan. 2009). From this, the court reasoned, the home-owners did not suffer any harm from the forgery, and thus would have no basis for opposing the imposition of an equitable remedy. "The clean hands doctrine is not properly invoked where the objectionable act does not affect the equitable relations between the parties." *Cox*, 408 B.R. at 418 (citing *Brooks v. Weik*, 219 P. 528, 532 (Kan. 1923)). The bankruptcy court cited a Wisconsin state court case, *Security Pacific Nat'l Bank v. Ginkowski*, 410 N.W.2d 589 (Wis. Ct. App. 1987), that similarly held that homeowners suffered no harm from a forgery where they intended to enter into a mortgage. *Id.* at 416.

Whether or not it is true that homeowners such as the Sutters are not harmed by a forged mortgage, the analysis in *Cox* is inconsistent with the Michigan Supreme Court's approach to the unclean hands doctrine as articulated in *Rose*. In *Rose*, a landowner, Rose, entered into a contract with an auction house to auction a piece of property, subject to Rose's right to withdraw the property prior to the auction. 646 N.W.2d at 457-58. Prior to the auction, Rose sought to withdraw the property out of concerns about the limited number of bidders. *Id.* at 458. To reassure Rose, the auction house promised that it would seed the auction with "shill bidders" to create a back-door method of returning the property to Rose. *Id.* Rose agreed, but the auction house failed

to properly implement the scheme, and the property was sold at a price far below the amount Rose sought. *Id.* at 459. Rose brought an action seeking to void the transfer of property under an equitable theory, citing fraudulent misrepresentations and breach of fiduciary duties on the part of the auction house. *Id.*

The Michigan Supreme Court concluded that unclean hands barred Rose from seeking equitable relief against the auction house, regardless of the merits of Rose's fraud and breach of fiduciary duty claims. *Rose*, 646 N.W.2d at 460-461. In reaching this conclusion, the Court did not analyze whether the party seeking to assert an unclean hands defense, the auction house, suffered any harm from the inequitable conduct of Rose. If they had, the Court could not have reached the result it did, because it is clear that the auction house did not suffer any harm from the inequitable conduct. After all, the auction house suggested and participated in the same scheme. It would be incongrous for the Michigan Supreme Court to allow an unclean hands defense where a party affirmatively participated in and benefited from inequitable conduct, but to foreclose a defense to a party that was simply unharmed by the conduct. As we are bound to follow the directions of the Michigan Supreme Court, we conclude that whether the Sutters were harmed by the forgery is irrelevant to whether an equitable mortgage can be imposed on the Sutter property, and cases saying otherwise are not applicable here.

Finally, Appellants argue that the balance of equities supports finding an equitable mortgage on the Sutter property. At the heart of this argument is the concern, expressed by the bankruptcy court at the April 2007 hearing, that the Sutters will receive a windfall in the form of a "free house," particularly as it is undisputed that the Sutters intended to grant a mortgage interest to World Wide. In the Appellants' view, the Sutters have exploited the bankruptcy process on two occasions to free themselves of otherwise valid obligations. Even if we were to consider a balance of the equities, the result would be the same. The fact that the Sutters have sought relief under the Bankruptcy Code twice is not, in itself, inequitable conduct that would justify imposing an equitable mortgage. Moreover, the Sutters have not receive and cannot receive a

bankruptcy discharge and remain liable for the now-unsecured note that was validly signed in California.**2** If the Sutters cannot meet their obligations under that note, we are aware of no bar to Appellants' bringing a debt collection action against the Sutters to collect on their claims, and they would potentially have access to remedies of a judgment lien creditor as to the Sutter property to collect the debt. It is far from certain that the Sutters will get a "free house" as the end result of this process.

III.

The district court correctly held that no mortgage, equitable or otherwise, exists on the Sutters' property. Therefore, we AFFIRM the judgment of the district court.

---

**2**The Sutters' Chapter 13 case, which initiated this appeal, was converted to a Chapter 7 action in December 2009. In April 2010, the Sutters were denied a Chapter 7 discharge based on their prior Chapter 7 discharge within an eight-year period. *See* 11 U.S.C. § 727(a)(8). In July 2011, the Chapter 7 trustee abandoned the assets of the Sutters' estate and filed a no distribution report, leading to the closing of the Chapter 7 case in August 2011 without a discharge. Thus, although the Sutters did not complete the payments under their plan, they also did not receive a discharge. Furthermore, the bankruptcy court and the parties, including the Sutters at oral argument, have acknowledged that the obligations of the Sutters under the note signed in 2004 are valid and will continue, regardless of our holding on the equitable mortgage question.